**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

BILLIE J. KLINE,

                Plaintiff,

                v.                         CAUSE NO.: 1:25-CV-112-TLS

FRANK BISIGNANO, Commissioner of the
Social Security Administration,

                Defendant.

## OPINION AND ORDER

The Plaintiff Billie J. Kline seeks review of the final decision of the Commissioner of the

Social Security Administration denying her applications for disability insurance benefits and

supplemental security income. She argues that the Administrative Law Judge (ALJ) failed to

provide a good explanation for rejecting the disabling opinion of the agency's prior testifying

medical expert, Dr. Stearns, resulting in an RFC that was not supported by substantial evidence

or the relevant legal standards. As set forth below, the Court finds that reversal and remand for

further proceedings is required for the ALJ to properly consider the opinion of Dr. Stearns.

## PROCEDURAL AND RELEVANT FACTUAL BACKGROUND

**A.      Initial Application and First ALJ Decision**

On March 8, 2017, the Plaintiff filed applications for disability insurance benefits and

supplemental security income, alleging disability beginning on April 1, 2014. AR 15, ECF No. 6.

After an unfavorable decision by ALJ Carlton, AR 15–23, the Plaintiff filed a complaint in

federal court, and on July 9, 2021, the district court reversed the ALJ's decision and remanded

for further proceedings based on the ALJ's review of the medical evidence. AR 838–43.

**B.      Second ALJ Decision and Lost Testimony of Medical Expert Dr. Zach Stearns**

On remand, the Plaintiff presented for a telephonic hearing before ALJ Adamo on March 21, 2022, during which medical expert Dr. Zach Stearns testified. AR 726. On November 2, 2022, ALJ Adamo held a new hearing, explaining there was no recording of the previous hearing, including the testimony of Dr. Stearns. AR 726, 756. The ALJ gave the Plaintiff's attorney Timothy Burns the option of either sending Dr. Stearns interrogatories or the ALJ and Attorney Burns both recounting their notes and agreeing on a summary of Dr. Stearns' testimony. AR 756. Attorney Burns summarized Dr. Stearns' testimony, including that, "when I crossed, [Dr. Stearns] agreed that [the Plaintiff] would probably miss one to two days a month type of thing." *Id.* Then, recounting in detail Dr. Stearns' RFC testimony, the ALJ described Dr. Stearns as testifying that the Plaintiff "would have flare-ups and miss a day or two of work, impossible to figure out exact amount. Work environment affects the flares, too, might need to miss a day or two a month, that was – yeah." AR 758. Attorney Burns agreed that this was a proper summary. AR 759. Attorney Burns then provided an opening statement, basing the Plaintiff's disability claim upon Dr. Stearns' "testimony about missing one to two days a month." *Id.*

On January 31, 2023, ALJ Adamo issued an unfavorable decision. AR 726–38. Relevant here, ALJ Adamo, who gave "great weight" to Dr. Stearns' RFC assessment, wrote,

> When questioned by the claimant's representative, Dr. Stearns testified the claimant *might* need to miss a day or two of work a month, but it is impossible to figure out when she would have flares, and the work environment would also affect attendance. Given the above physical findings and the uncertainty regarding missed work based on the evidence in the record, a limitation regarding attendance at work is not supported.

AR 734–35. The Plaintiff filed a complaint in federal court and an opening brief arguing the ALJ failed to provide a good explanation for rejecting Dr. Stearn's opinion that the Plaintiff would

probably miss one to two days of work a month. ECF No. 16, *Kline v. O'Malley*, 1:23-CV-218 (N.D. Ind. Dec. 29, 2023). The Commissioner filed an agreed motion to remand, which was granted. AR 2550.

**C.      Relevant Medical Evidence Available for Third ALJ Decision on Remand**

The following is some of the medical evidence on remand that is relevant to the instant appeal but is not meant to summarize the Plaintiff's extensive medical record since 2014.

In October 2014, the Plaintiff presented to establish care, complaining of shoulder pain that started in her neck before radiating to her right shoulder and lower back pain that radiated to her right leg down to the lateral side of her right knee. AR 364. The Plaintiff described her pain as "severe pain [that] comes and goes." *Id.* The Plaintiff was assessed with lumbar spine pain, radiculopathy, depression, anxiety, fatigue, and cervical spine pain. AR 366.

An October 27, 2014 MRI of her lumbosacral spine revealed at L5-S1 a "small to moderate broad-based right central disc protrusion with annular fissure contacting the descending left and mildly posteriorly displacing the descending right S1 nerve roots." AR 312, 313. The MRI also demonstrated disc osteophyte complex lateralizing to the left with mild to moderate left and mild right foraminal stenosis. AR 313.

On December 1, 2014, the Plaintiff presented to pain management specialist Dr. Ashwin Madupu for continued treatment of her lower back pain, describing her pain as progressively worsening and that is deep, sharp, aching, and stabbing in character and a 7 out of 10 in severity. AR 437. She reported aggravating factors including lifting, daily activities, and bending. *Id.* She demonstrated tenderness over the lumbar spine and paraspinous muscles and was positive for facet loading with back extension and rotation upon physical examination. AR 440. Dr. Madupu assessed myalgia and myositis, low back pain, degenerative disc disease of the lumbar spine, and

lumbar spinal stenosis; prescribed 300mg Gabapentin; and ordered a TENS unit to help reduce the Plaintiff's recurring pain. AR 442.

On December 22, 2014, the Plaintiff presented to her primary care physician, Dr. Stewart, complaining of unresolved shoulder and low back pain. AR 360. She reported that neurosurgeon Dr. Silvidi did not recommend surgical intervention, instead recommending medication. *Id.* Treatment with muscle relaxers yielded no benefit. *Id.* Dr. Stewart started her on hydrocodone for pain. AR 362–63. On January 14, 2015, the Plaintiff reported continued lower back pain radiating to the right hip and middle spine. AR 355. On February 3, 2015, she received a lumbar epidural steroid injection. AR 452. However, on February 27, 2015, the Plaintiff reported that the injection "did not help beyond a few days." AR 351. Dr. Stewart continued the Plaintiff's hydrocodone and set a follow-up appointment. AR 353. On June 10, 2015, with the Plaintiff's pain unresolved and spreading to her right hip and knee, AR 347, Dr. Stewart increased the hydrocodone and increased the frequency of follow-up appointments, AR 349.

On July 8, 2015, the Plaintiff complained of continued pain in her lower back that is constant, reporting no improvement in symptoms or functioning, and listing aggravating factors such as walking, standing, and daily activities. AR 454, 455. She reported increasing pain despite using TENS unit and previous steroid injections. AR 455. Upon physical examination, she demonstrated tenderness along her right sacroiliac joint ("SIJ") and exhibited a positive Faber's and Gillet test. *Id.* Dr. Madupu determined that "most of [Plaintiff's] pain is secondary to SIJ arthropathy" and recommended further steroid injections in Plaintiff's SIJ. AR 459.

On August 7, 2015, the Plaintiff reported low back pain into the right hip and informed Dr. Stewart that the pain in her knee had worsened such that her "right knee occasionally wants to give out." AR 343. Upon physical examination, she demonstrated a positive straight leg test.

AR 345. Dr. Stewart continued the Plaintiff's pain medications and instructed her to continue follow-up care. *Id.*

On September 8, 2015, the Plaintiff received another steroid injection. AR 460. On October 20, 2015, Plaintiff reported that the steroid injection made her back pain "no better" and described her recurring pain as 8 of 10 in severity with pain medications helping. AR 339.

On April 27, 2016, the Plaintiff reported drowsiness as a side effect of her medication; anxiety, depression, and panic attacks; and unresolved pain, stating that "[s]he can't sit too long or stand too long." AR 329. On May 27, 2016, she reported unresolved low back pain radiating into her right hip and described this pain as a 7 to 10 out of 10. AR 324. Dr. Stewart continued her pain medications and increased Xanax. AR 326.

By her next appointment with Dr. Stewart, she had achieved some improvement in her back pain, taking four hydrocodone a day. AR 319, 321. However, during a pain assessment on November 28, 2016, she described her pain as sharp and shooting. AR 621.

On February 20, 2017, the Plaintiff complained of increased pain after falling on her right hip, describing her pain as 9 out of 10 shooting pain that starts in her lower back and radiates down her leg and into her foot. AR 415. She reported constant stress and more frequent panic attacks with associated chest pain. *Id.* Upon physical examination, the Plaintiff exhibited a positive straight leg raise, left worse than right, at thirty degrees. *Id.*

On February 27, 2017, the Plaintiff underwent an MRI study of her lumbar spine that revealed a large, extruded disc fragment at L5-S1 that was compressing the traversing right S1 nerve root in the lateral recess. AR 404. The report noted: "This is much larger than the prior examination of 2014." *Id.*

On March 3, 2017, the Plaintiff reported that she was "having a lot of pain" in her lower back and down her right leg. AR 411. She also reported continued panic attacks with associated shortness of breath and chest pain. *Id.* Dr. Stewart recommended that she see a neurosurgeon to discuss possible surgical intervention to treat her pain. AR 412.

She saw Dr. Madupu for pain management on March 23, 2017, reporting worsening pain that was a constant 7 out of 10 and new onset of radicular pain in the right S1 distribution. AR 468. When she met with Dr. Madupu again on April 3, 2017, the Plaintiff reported no change in her symptoms or functioning. AR 478. She had not yet seen the neurosurgeon. *Id.*

On June 4, 2018, the Plaintiff reported to Dr. Stewart tiredness, depression, and pain in her neck and left shoulder with numbness in her left hand. AR 719. Upon physical examination, the Plaintiff exhibited reduced range of motion and a positive Tinel's sign. *Id.* An x-ray of the Plaintiff's cervical spine the same day revealed left C5-C6 intervertebral foramina narrowing associated with uncovertebral and facet hypertrophy. AR 721.

**D.     Third ALJ Decision Under Review and Testimony of Medical Expert Dr. Kwok**

On remand, ALJ Meredith Jacques held a telephonic hearing on November 4, 2024. AR 2477. The Plaintiff was again represented by Attorney Burns, and medical expert Dr. John Kwok testified. AR 2479, 2482.

Dr. Kwok testified that the Plaintiff's impairments did not meet a listing and that she could perform light exertion work with frequent use of the feet for pushing, pulling, and operating of pedals; frequent climbing ladders, scaffolds, stooping, crouching and crawling; and frequent exposure to unprotected heights and proximity to heavy machinery. AR 2487–88. When asked whether he agreed with Dr. Stearns' testimony that the Plaintiff's pain would likely cause her to be absent from work, Dr. Kwok testified that he did not agree because "it's the nature and

severity of the impairments that are identified. I think given the x-ray finding and also the clinical findings on some physical examinations just in my mind, don't support that level or that level of problems that this individual, you know, might see." AR 2489.

When asked if he considered the Plaintiff's pain complaints, Dr. Kwok testified that there was not an objective basis to explain the extent of her pain complaints. AR 2490. Attorney Burns pointed to the 2017 MRI indicating compression of the S1 nerve root as an objective basis for her pain. AR 2490. Dr. Kwok responded that

> just because you have a finding on x-ray, that does not necessarily translate into physiological or clinical disease that the patient in a sense may have. In this particular case, we have to deal with context of the right S1, you know. What we have to do with that now is to go through the clinical findings or clinical sources such as the findings on the physical examination, the findings on the EMT, that be consistent with, you know, pathology involving the right S1 nerve root.

2490–91. He stated that the clinical findings "don't have evidence that strongly suggests or supports the presence of a right S1 issue." AR 2491.

Attorney Burns then asked Dr. Kwok, "So the fact that she has the clinical signs of decreased range of motion, pain, positive straight leg raising, those things are not clinically significant?" AR 2491. Dr. Kwok responded:

> Just because. . . the observations made on a physical examination are objective. This is what the physician saw on that day. But when you talk about range of motion or muscle strength and things like this, okay, there are many, many actors beside physiological, you know, factors that may produce that particular finding. And the job of a physician is not to simply say that there's reasons, but now to explain why there would be that because, you know, that he had observed on that examination that day. And then if you – and so, what I'm trying to say is that to some extent, the finding that you have listed are subjective in nature to a certain degree. In other words, you ask the patient and the patient basically has to show you a response.

AR 2491–92.

The Plaintiff testified that she treated her pain with Oxycodone 5mg, twice per day, which was a lower dose than she previously due to "the government has cracked down." AR

2497. She testified that the dose was not sufficient but her doctor could not prescribe her a higher dose. AR 2498. She testified she declined back surgery in 2017 because her physician could not assure her of the extent to which surgery would relieve her pain. AR 2502–03.

The vocational expert testified that a hypothetical person with the Plaintiff's RFC could not perform her past relevant work but could perform a significant number of other jobs in the national economy. AR 2514–15. He testified that an employer would not tolerate an employee being absent one day a month, including arriving fifteen minutes late or leaving fifteen minutes early. AR 2518–19.

On November 19, 2024, ALJ Jacques issued an unfavorable decision, AR 2443, which is the final decision of the Commissioner. *Jozefyk v. Berryhill*, 923 F.3d 492, 496 (7th Cir. 2019). The Plaintiff now seeks judicial review under 42 U.S.C. § 405(g). On March 11, 2025, the Plaintiff filed her Complaint [ECF No. 1] in this Court, seeking reversal of the Commissioner's final decision. The Plaintiff filed an opening brief, the Commissioner filed a response brief, and the Plaintiff filed a reply brief. ECF Nos.14, 16, 17.

## THE ALJ'S DECISION

For purposes of disability insurance benefits and supplemental security income, a claimant is "disabled" if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see* 20 C.F.R. § 404.1505(a).[1] To be found disabled, a claimant must have a severe physical or mental impairment that prevents her from doing not only her previous work, but also any other kind of gainful employment that exists in the national

---

[1] The Court cites the disability insurance benefits statutes and regulations, which are largely identical to those applicable to supplemental security income. *See Barnhart v. Thomas*, 540 U.S. 20, 24 (2003).

economy, considering her age, education, and work experience. 42 U.S.C. § 423(d)(2)(A); 20

C.F.R. § 404.1505(a). An ALJ conducts a five-step inquiry to determine whether a claimant is

disabled. 20 C.F.R. § 404.1520. The claimant bears the burden of proving steps one through four,

whereas the burden at step five is on the ALJ. *Zurawski v. Halter*, 245 F.3d 881, 885–86 (7th Cir.

2001); *see* 20 C.F.R. § 404.1512.

The first step is to determine whether the claimant is no longer engaged in substantial

gainful activity. *Id.* § 404.1520(a)(4)(i), (b). In this case, the ALJ found that the Plaintiff had not

engaged in substantial gainful activity since April 1, 2014, the alleged onset date. AR 2449.

At step two, the ALJ determines whether the claimant has a "severe impairment." 20

C.F.R. § 404.1520(a)(4)(ii), (c). Here, the ALJ determined that the Plaintiff has the severe

impairments of degenerative disc disease with disk herniation, degenerative disc disease at the

C5-6 level, chronic pain syndrome, allergies/chronic sinusitis, morbid obesity, depression,

attention deficit hyperactivity disorder (ADHD), and anxiety. AR 2449.

Step three requires the ALJ to consider whether the claimant's impairment(s) "meets or

equals one of [the] listings [in appendix 1 to subpart P of part 404 of this chapter]." 20 C.F.R.

§ 404.1520(a)(4)(iii), (d). If a claimant's impairment(s), considered singly or in combination

with other impairments, meets or equals a listed impairment, the claimant will be found disabled

without considering age, education, and work experience. *Id*. § 404.1520(a)(4)(iii), (d). Here, the

ALJ found that the Plaintiff does not have an impairment or combination of impairments that

meets or medically equals a listing, indicating that she considered Listings 1.15, 1.16, 3.02,

12.04, 12.06, and 12.11. AR 2450.

When a claimant's impairment(s) does not meet or equal a listing, the ALJ determines the

claimant's "residual functional capacity" (RFC), which "is an administrative assessment of what

work-related activities an individual can perform despite [the individual's] limitations." *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001); *see* 20 C.F.R. § 404.1520(e). In this case, the ALJ assessed the following RFC:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except: she can never climb ladders, ropes or scaffolds; she can occasionally climb ramps or stairs; she can occasionally balance as defined in the Selective Characteristics of Occupations (SCO) of the Dictionary of Occupational Titles (DOT); she can occasionally stoop, kneel, crouch, and crawl; she can tolerate occasional exposure to hazards, such as unprotected heights and unguarded moving mechanical parts; she can have frequent use of foot controls; she must avoid concentrated exposure to wetness or slippery surfaces, vibration, and exposure to dust, odors, fumes, and pulmonary irritants – as defined in the SCO of the DOT; she can understand, remember, and carry out simple instructions and tasks; and she can deal with occasional changes in a routine work setting.

AR 2454.

The ALJ then moves to step four and determines whether the claimant can do her past relevant work in light of the RFC. 20 C.F.R. § 404.1520(a)(4)(iv), (f). Here, the ALJ found that the Plaintiff is unable to perform any past relevant work under 20 C.F.R. § 404.1565. AR 2462.

If the claimant is unable to perform past relevant work, the ALJ considers at step five whether the claimant can "make an adjustment to other work" given the RFC and the claimant's age, education, and work experience. 20 C.F.R. § 404.1520(a)(4)(v), (g). In this case, the ALJ found that the Plaintiff is not disabled because the Plaintiff can perform significant jobs in the national economy of office helper, mail room clerk, and cafeteria attendant. AR 2463.

## STANDARD OF REVIEW

The Social Security Act authorizes judicial review of the agency's final decision. 42 U.S.C. § 405(g). On review, a court considers whether the ALJ applied the correct legal standard and whether the decision is supported by substantial evidence. *See Summers v. Berryhill*, 864 F.3d 523, 526 (7th Cir. 2017); 42 U.S.C. § 405(g). A court will affirm the Commissioner's

findings of fact and denial of disability benefits if they are supported by substantial evidence. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019) (citations omitted). Even if reasonable minds could differ about the disability status of the claimant, the court must affirm the Commissioner's decision if it is adequately supported. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008) (citation omitted).

The court considers the entire administrative record but does not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute [the court's] own judgment for that of the Commissioner." *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011) (quoting *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)). Nevertheless, the court conducts a "critical review of the evidence," and "the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." *Lopez*, 336 F.3d at 539 (citations omitted); *see Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014) ("A decision that lacks adequate discussion of the issues will be remanded."). The ALJ is not required to address every piece of evidence or testimony presented, but the ALJ "has a basic obligation to develop a full and fair record and must build an accurate and logical bridge between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings." *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014) (cleaned up). However, "if the Commissioner commits an error of law," remand is warranted "without regard to the volume of evidence in support of the factual findings." *White ex rel. Smith v. Apfel*, 167 F.3d 369, 373 (7th Cir. 1999) (citation omitted).

## ANALYSIS

In this appeal, the Plaintiff challenges ALJ Jacques' discussion of Dr. Stearns' opinion given at the hearing in March 2022, the recording of which was not preserved. The Plaintiff

argues that the ALJ failed to give a "good explanation" for rejecting Dr. Stearns' disabling opinion that the Plaintiff would likely miss one to two days of work a month. The Court agrees.

Under the regulations applicable to the Plaintiff's claim, which was filed before March 27, 2017, an ALJ has an obligation to evaluate every medical opinion and explain the weight given to the opinion. *See* 20 C.F.R. § 404.1527(c). Medical opinions are weighed by considering whether there is an examining relationship; whether there is a treatment relationship; supportability ("We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim . . . ."); consistency; and specialization. *Id.* § 404.1527(c)(1)–(6). "[T]he RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." SSR 96-8p, 1996 WL 374184, at *7 (July 2, 1996). As noted above, an ALJ "must build an accurate and logical bridge between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings. If the evidence does not support the conclusion, we cannot uphold the decision." *Beardsley*, 758 F.3d at 837.

As detailed above, at the November 2022 hearing, ALJ Adamo summarized medical expert Dr. Stearns' testimony from the earlier March 2022 hearing, for which there was no recording, that the Plaintiff would likely be absent from any job one to two days per month secondary to "flareups" but that it was impossible to figure out the exact number of absences. The Plaintiff argues that this opinion was independently disabling because the vocational expert at the current November 4, 2024 hearing, on whom ALJ Jacques relies to find the Plaintiff could perform jobs in the national economy, testified that an individual who missed one day a month, including being fifteen minutes late or leaving fifteen minutes early, could not sustain competitive employment.

In her decision, ALJ Jacques provides the following in the RFC analysis as to Dr.

Stearns' testimony:

> At the prior hearing, Zach Stearns, MD, provided an opinion statement (Exhibit 32E [Nov. 2, 2024 hearing transcript]). Dr. Stearns opined that the claimant would be able to lift ten pounds frequently and twenty pounds occasionally; she could sit for four or six hours of an eight hour day; she could stand and walk for one or two hours at a time; she would have no upper extremity limitations except frequent overhead reaching; she could frequently use foot controls; she could occasionally climb ramps, and stairs; she could occasionally balance, stoop, kneel, crouch, and crawl; she could never climb ladders, ropes, and scaffolds; she could have occasional exposure to unprotected heights and motorized vehicles; *that she would have flare ups and pain and that she <u>might</u> miss a day or two of work*. The undersigned gives little weight to the opinion of Dr. Stearns. As the hearing record at the prior hearing was defective, the opinion is a summation from the prior Administrative Law Judge which is difficult to follow and contradictory at times. Also, given the limited objective physical evidence along with no more than conservative treatment over a ten year period as well as *the opinion of John F. Kwock, MD, who noted specifically that the claimant would not be expected to have absences based on his review of the record*, the opinion is given little weight.

AR 2460 (emphasis added).

The Plaintiff argues that relying on the opinion of Dr. Kwok is not a "good explanation"

for rejecting Dr. Stearns' opinion regarding absences because Dr. Kwok's testimony is contrary

to the regulations and effectively denies objective medical facts. When analyzing a disability

claim, the ALJ must consider all symptoms, including pain, and the extent to which those

"symptoms can reasonably be accepted as consistent with the objective medical evidence and

other evidence." 20 C.F.R. § 404.1529(a); SSR 16-3p, 2017 WL 5180304, at *2 (Oct. 25, 2017).

Subjective allegations of disabling symptoms alone cannot support a finding of disability. SSR

16-3p, 2017 WL 5180304, at *2. "Objective medical evidence is evidence obtained from the

application of medically acceptable clinical and laboratory diagnostic techniques, such as

evidence of reduced joint motion, muscle spasm, sensory deficit or motor disruption." 20 C.F.R.

§ 404.1529(c)(2); *Aujua L. v. Comm'r of Soc. Sec.*, No. 3:24-CV-466, 2025 WL 958316, at *11

n.8 (S.D. Ill. Mar. 31, 2025) ("As an example, measurements of Plaintiff's BMI, oxygen saturation, and range of motion undoubtedly constitute objective medical evidence."); *Amaris S. v. O'Malley*, No. 24-CV-69, 2024 WL 4602910, at *13 (E.D. Wis. Oct. 29, 2024) ("The ALJ only cited objective medical evidence, such as strength and range of motion . . . ."); *Cynthia A. v. O'Malley*, No. 22 C 596, 2024 WL 4170205, at *3 (N.D. Ill. Sept. 12, 2024) (listing the objective evidence in the record as antalgic gait; knee swelling; knee tenderness; diminished shoulder, knee, and hip range of motion; slow and limping gait and an inability to heel-toe walk; degenerative joint disease of the ankle; degenerative disc disease of the cervical spine; and decreased joint space in the hip); *Susan G. v. Kijakazi*, No. 20 C 6110, 2023 WL 2525495, at *7 (N.D. Ill. Mar. 15, 2023) (listing the objective evidence of record considered by the ALJ as "specific exam findings that Plaintiff had normal gait, normal neurological findings, negative straight leg raise, and normal range of motion in her lumbar area with some pain worsening on extremes of flexion and extension"). Objective medical evidence "is a useful indicator to assist . . . in making reasonable conclusions about the intensity and persistence of [the claimant's] symptoms and the effect those symptoms, such as pain, may have on [the claimant's] ability to work." 20 C.F.R. § 404.1529(c)(2); *see* SSR 16-3p, 2017 WL 5180304, at *5.

More specifically, the Plaintiff argues that Dr. Kwok's testimony that the objective findings on her MRI would not cause the level of pain that would lead her to be absent is inconsistent with her treating physician deeming her pain significant enough to regularly treat her with narcotic medications and refer her to a surgeon. The February 2017 MRI of the Plaintiff's lumbar spine, taken three years after her alleged onset date and two years before her date-last-insured, demonstrated "large extruded disc fragment L5-S1 compresses the traversing right S1 nerve root in the lateral recess. This is much larger than on the prior examination of

2014." AR 404. When asked if the Plaintiff's "nerve root compromise" would objectively support the levels of pain that would cause someone to miss work a few days a month, Dr. Kwok did not discuss the 2017 MRI but referenced the 2018 x-ray and that he was taught "never to simply treat an x-ray" because it "does not necessarily translate into physiological or clinical disease that the patient in a sense may have." AR 2490. He also testified that "the physical examinations through the years 2014 to 2023, don't have evidence that strongly suggests or supports the presence of a right S1 issue." AR 2491. But when confronted with correlating clinical findings of decreased range of motion, pain, and positive straight leg raising tests, he testified that "the finding that you have listed are subjective in nature to a certain degree." *Id.*

In other words, Dr. Kwok is effectively opining that the objective imaging cannot be trusted despite being ordered and interpreted by the Plaintiff's treating physician as a result of symptoms that suggest a serious etiology. More concerning, when presented with correlating clinical findings of limited range of motion, positive straight leg raising test, and observed pain behaviors, Dr. Kwok responded that the observations were "subjective" because of the possibility of something beyond the "physiological" for the exam's results. But the regulations specifically require the ALJ to consider such objective medical findings when evaluating the Plaintiff's pain. And, as noted by the Plaintiff, the musculoskeletal listings require that compromise of a nerve root be demonstrated by positive straight leg raising test. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00F(2)(c) ("When a nerve root of the lumbar spine is compromised, we require a positive straight-leg raising test. . . ."). Based on the Plaintiff's arguments, the ALJ's reliance on Dr. Kwok's opinion to reject Dr. Stearns' opinion is not supported by substantial evidence.

In response, the Defendant does not engage with Dr. Kwok's testimony but offers a one-sentence assertion that the Plaintiff is improperly requesting that the Court reweigh the opinion evidence. The Court disagrees. The Plaintiff is asking the Court to consider the ALJ's reasons for giving no weight to Dr. Stearns' opinion on absences. She argues that the reliance on Dr. Kwok's opinion is not a good reason because his opinion contradicts the regulations regarding objective evidence and does not consider the evidence of record—the 2017 MRI and the objective clinical findings—that are consistent with the Plaintiff's asserted pain that would result in absences. In other words, the Plaintiff is asking the Court to find that the ALJ did not create a logical bridge between the evidence and her decision. As cited by the Plaintiff and not addressed by the Defendant, the court in *Wilder v. Apfel* was faced with a medical expert at the first hearing who opined as to disabling limitations that the ALJ failed to adopt and, on remand, a second medical expert who offered a non-disabling opinion that the ALJ did adopt. 153 F.3d 799, 802 (7th Cir. 1998). The court concluded that the second opinion was "no more reasoned that the first one" and awarded benefits because of the agency's "obduracy." *Id.* at 802, 804.

Notably, ALJ Jacques only gave Dr. Kwok's RFC determination "some weight" and then assessed greater postural and environmental limitations in the RFC based on the Plaintiff's testimony and the combined effect of all her impairments. AR 2461. It is unclear why Dr. Kwok's opinion on absences would then be given "great weight." Especially given that his opinion on absences was based on an explanation that is contrary to the governing regulations. *See Wilder*, 153 F.3d at 802 (rejecting a medical expert's testimony as making an incorrect legal judgment). As in *Wilder*, if Dr. Kwok's opinion on absences were rejected "as contaminated by legal confusion," this would leave Dr. Stearns' testimony that the Plaintiff would likely miss one

to two days of work a month due to her impairments. *Id.* at 803. The Defendant offers no substantive argument that Dr. Stearns' opinion is not supported by the record.

Even under the deferential review afforded the ALJ's opinion, *see Morales v. O'Malley*, 103 F.4th 469, 471 (7th Cir. 2024) (citing *Warnell v. O'Malley*, 97 F.4th 1050, 1053 (7th Cir. 2024)), the Court finds that the ALJ has not supported this aspect of her decision with substantial evidence and has not built a logical bridge between the evidence and the decision.

Finally, the Court briefly addresses the Defendant's other arguments. First, the Defendant attempts to create a distinction between Attorney Burns' recollection that Dr. Stearns testified that the Plaintiff "would probably miss one to two days a month type of thing" ("probable") and the ALJ's recollection that Dr. Stearns testified the Plaintiff "would have flare-ups and miss a day or two of work, impossible to figure out exact amount" ("possible"). But ALJ Jacques did not discuss this purported distinction.

The Defendant also notes that ALJ Adamo had offered to send interrogatories to Dr. Stearns, which Attorney Burns declined at the hearing. But the testimony shows that ALJ Adamo offered the interrogatories as an alternative to the ALJ and Attorney Burns comparing their notes and agreeing on Dr. Stearns testimony. Finding that their notes were the same, Attorney Burns opted to agree with the ALJ's summary. Thus, as argued by the Plaintiff, it appears that Attorney Burns understood them both to be saying that Dr. Stearns opined that the Plaintiff "would probably miss one to two day a month type of thing." In other words, the apparent agreement between the ALJ and Attorney Burns at the hearing was not entirely consistent with ALJ Adamo's ultimate treatment of Dr. Stearns' testimony in his decision.

The Defendant then asserts that ALJ Jacques "noted . . . the summaries of the testimony are 'difficult to follow and contradictory at times.'" Resp. 5, ECF No. 16 (citing AR 2460). But

that is an incorrect description of ALJ Jacques' reasoning. She did not refer to both summaries but only to ALJ Adamo's summary at the hearing: "As the hearing record at the prior hearing was defective, the opinion is a summation from the prior Administrative Law Judge which is difficult to follow and contradictory at times." AR 2460. And ALJ Jacques does not explain how ALJ Adamo's summation of Dr. Stearns' opinion is contradictory.

Next, the Defendant contends the Plaintiff is arguing "that not having a record of what Dr. Stearns actually said and that the contradictory nature of the subsequent summaries are not a 'good explanation' for discounting the putative restrictions on missing work." Resp. 5. First, this statement again misreads ALJ Jacques' decision as referencing both summaries. Second, the request for remand is not based on there being no recording of Dr. Stearns' testimony but rather that Dr. Stearns appears to have opined the Plaintiff would miss one to two days of work a month and that the ALJ did not give a good explanation for rejecting that opinion.

Last, the Defendant is correct that the Plaintiff's opening brief cites no law that ALJ Jacques was required to call Dr. Stearns to testify. Nevertheless, during ALJ Adamo and Attorney Burns' discussion of Dr. Stearns' prior, unrecorded testimony, ALJ Adamo stated that Dr. Stearns testified that the Plaintiff "would have flare-ups and miss a day or two of work, impossible to figure exact amount." AR 758. Thus, as argued by the Plaintiff, the possibility that the agency's own testifying medical expert testified to the likelihood of a disabling impairment is worth confirming. The agency on remand will determine how to resolve this issue. But on the decision under review, the ALJ has not given a good explanation for rejecting the opinion.

As a final matter, the Plaintiff seeks, in the alternative, reversal and an award of benefits, arguing that the SSA has acted in a manner not indicative of a fair process or an attempt to issue a decision supported by substantial evidence but rather an adversarial party only interested in

denying her application for benefits. *See Wilder*, 153 F.3d at 804; *Janet L. v. Kijakazi*, No. 1:20-CV-1685, 2021 WL 3878649, *8 (S.D. Ind. Aug. 31, 2021). "An award of benefits is appropriate . . . only if all factual issues involved in the entitlement determination have been resolved and the resulting record supports only one conclusion—that the applicant qualifies for disability benefits." *Allord v. Astrue*, 631 F.3d 411, 415 (7th Cir. 2011) (citing *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 355 (7th Cir. 2005)). Based on the discussion above, the Court cannot say that an immediate award of benefits is appropriate in this case. The Court reverses and remands for further proceedings so the ALJ can support her decision regarding absences with substantial evidence.

## CONCLUSION

For the reasons stated above, the Court GRANTS the relief sought in the Plaintiff's Brief [ECF No. 14] and REVERSES the decision of the Commissioner. The Court REMANDS this matter for further proceedings consistent with this Opinion. The Court DENIES the Plaintiff's request to award benefits.

SO ORDERED on March 6, 2026.

s/ Theresa L. Springmann
JUDGE THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT